**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JANE SMITH,

MARY DOE,

                                        Plaintiffs,

                -against-

ANTHONY J. ANNUCCI, Acting Commissioner
of the New York State Department of Corrections
and Community Supervision,

JASON EFFMAN, Associate Commissioner and
PREA Coordinator for New York State Department
of Corrections and Community Supervision,

STEVEN MAHER, Chief of Investigations, Office
of Special Investigations, New York State
Department of Corrections and Community
Supervision,

CHRISTIAN NUNEZ, Deputy Chief of the Sex
Crimes Division, Office of Special Investigations,
New York State Department of Corrections and
Community Supervision,

JOHN SHIPLEY, Director, Bureau of Labor
Relations, New York State Department of
Corrections and Community Supervision,

SABINA KAPLAN, Superintendent of Bedford
Hills Correctional Facility,

MICHAEL DAYE, Deputy Superintendent for
Security at Bedford Hills Correctional Facility,

ELAINE VELEZ, Assistant Deputy Superintendent
and PREA Compliance Manager at Bedford Hills
Correctional Facility,

CAPTAIN A, Captain at Bedford Hills Correctional
Facility,

1:21-CV-01715-RA-OTW [rel. 1:17-
CV-07954-RA-OTW]


**AMENDED COMPLAINT**
**[REDACTED]**

**Jury Trial Demanded**

CAPTAIN B, Captain at Bedford Hills Correctional
Facility,

LIEUTENANT A, Lieutenant at Bedford Hills
Correctional Facility,

SERGEANT A, Sergeant at Bedford Hills
Correctional Facility,

SERGEANT B, Sergeant at Bedford Hills
Correctional Facility,

OFFICER A, Correction Officer at Bedford Hills
Correctional Facility,

OFFICER B, Correction Officer at Bedford Hills
Correctional Facility,

OFFICER C, Correction Officer at Bedford Hills
Correctional Facility,

OFFICER D, Correction Officer at Bedford Hills
Correctional Facility,

OFFICER E, Correction Officer at Bedford Hills
Correctional Facility,

UNIDENTIFIED OFFICER, Correction Officer at
Bedford Hills Correctional Facility,

GRIEVANCE SUPERVISOR A, Grievance
Supervisor at Bedford Hills Correctional Facility,

INVESTIGATOR A, Investigator at Bedford Hills
Correctional Facility,

                                        Defendants.

Plaintiffs Jane Smith and Mary Doe ("Plaintiffs"), by and through their

undersigned attorneys, for their Complaint against Defendants Annucci, Effman, Maher,

Nunez, Shipley, Kaplan, Daye, Velez, Captain A, Captain B, Lieutenant A, Sergeant A,

Sergeant B, Officer A, Officer B, Officer C, Officer D, Officer E, Unidentified Officer,

Grievance Supervisor A and Investigator A ("Defendants"),[1] allege, upon knowledge

with respect to their acts and on information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this civil rights action, after having been raped,

sexually exploited and sexually harassed by prison guards while imprisoned in Bedford

Hills Correctional Facility ("BHCF"), a maximum security women's prison run by the

New York State Department of Corrections and Community Supervision ("DOCCS").

2.      There has been and continues to be an astonishingly high rate of

sexual abuse of women in custody by prison staff,[2] particularly within BHCF, which has

among the highest rate of allegations of sexual victimization of all New York prisons.[3]

3.      While BHCF is an all-women's prison, the vast majority of guards

and supervisory staff are men.

4.      Plaintiffs are particularly vulnerable to sexual victimization.  Ms.

Smith is a petite woman with an intellectual disability and mental illness, who has

experienced sexual abuse and exploitation since she was thirteen years old, including

repeated rapes and sexual assaults by a guard in a New York City jail on Rikers Island

while awaiting trial on the charges for which she is currently serving time.  Ms. Doe has

likewise experienced sexual exploitation since a young age.  She was forced to start

---

[1] The names of the Defendants are based on best information and Plaintiff's recollection.  Any errors in spelling will be resolved during the course of discovery.

[2] Chandra Bozelko, *Sexual Violence in Women's Prisons Reaches "Constitutional Proportions." Will Lawmakers Step In?*, Ms. Magazine (April 23, 2020), https://msmagazine.com/2020/04/23/sexual-violence-in-womens-prisons-reaches-constitutional-proportions-will-lawmakers-step-in/ ("Incarcerated women are 30 times more likely to be raped than free women. Even though women account for less than 10 percent of inmates, their reports account for three quarters of assaults, and almost three-quarters of staff are men.").

[3] DOCCS, *Annual Report on Sexual Victimization:  An Analysis of 2013-2017 Sexual Abuse and Sexual Harassment Data*, Appendix A (May 2020), https://doccs.ny.gov/system/files/documents/2020/06/annual-report-on-sexual-victimization-2013-2017_final.pdf [hereinafter DOCCS, *2013-2017 Report*].

stripping at age thirteen, and since then has experienced severe sexual abuse and trauma. At only fourteen years old, Ms. Doe was the victim of a gang rape, which resulted in a pregnancy, and Ms. Doe was forced to continue stripping during her pregnancy and after the birth of her child.

5.      Despite knowing of the high risk of sexual abuse of women prisoners in general, and the especially significant risk to Ms. Smith in particular, DOCCS supervisors, including those at BHCF, cultivated a culture that enabled DOCCS staff to prey on Plaintiffs' vulnerabilities and deliberately disregarded a widespread practice of DOCCS personnel exchanging lenient treatment for sexual acts with inmates. In particular, DOCCS staff were able to have frequent, unmonitored and solo access to women in their control for significant periods of time, and they were not required to wear or turn on body cameras when out of sight of fixed cameras.  DOCCS staff worked together to enable unlawful and exploitative sexual contact with women inmates, and they retaliated against women who reported abuse or took steps to protect themselves. DOCCS supervisors knew that there was ample opportunity for sexual misconduct between guards and inmates at BHCF, and that it in fact occurred, but failed to take appropriate action to address it.  In fact, many of the incidents of sexual abuse endured by Plaintiffs involved a supervisory staff member being an observer or active participant.

6.      Both Ms. Doe and Ms. Smith were sexually assaulted while in custody at BHCF.  In or around February or March of 2019, Ms. Doe was targeted and assaulted by Defendant Sergeant B while she was performing her work assignment.  In particular, Ms. Doe was alone cleaning the bathroom in the school building when Defendant Sergeant B barged in, blocked Ms. Doe's exit, punched her so hard in the

4

stomach that she lost her breath and forced her to perform oral sex.  Although Ms. Doe

resisted, Defendant Sergeant B made clear that he would make the rest of her time in

custody difficult and would "make problems" for her when she was released if she

refused.  Ms. Doe felt she had no choice but to comply.  After Defendant Sergeant B

ejaculated, Ms. Doe left the bathroom as quickly as she could, only to realize that another

officer was sitting at the desk stationed outside the bathroom, seemingly aware of the

assault that Ms. Doe had just suffered.  Ms. Doe was visibly upset and asked the officer if

she could return to her housing unit.  The officer smirked and authorized her early return.

Ms. Doe did not report her assault at the time for fear of retaliation from Defendant

Sergeant B and other DOCCS staff, and because she ultimately knew that it would be her

word against a sergeant's.

       7.     Ms. Smith likewise experienced sexual assault and harassment

while in BHCF custody.  The grooming for her sexual victimization began shortly after

she arrived at BHCF in 2015.  She is 4'11" and weighed approximately 115 pounds.  Her

criminal history reflected multiple arrests for prostitution and her prison intake form

described her mental illness in detail, which was known to the inmate population and

prison staff.  She first encountered Defendant Officer C in the medical clinic where Ms.

Smith received her psychiatric medication.  Defendant Officer C's regular post was in the

area where inmates received medication; as a result, Ms. Smith saw him frequently.

Defendant Officer C was known within the BHCF population to be physically aggressive

and to have carried on an extended and open sexual relationship with at least one inmate.

On several occasions, Defendant Officer C commented on Ms. Smith's body and

attractiveness, made comments about wanting to have sex with her and gave her gifts of

contraband hoping that she would reciprocate with sexual activity.  Ms. Smith, however, would not reciprocate.  On one occasion, Defendant Officer C followed her into the inmate women's bathroom ostensibly to investigate whether she had contraband.  While alone in the bathroom, he stood in front of the door and tried to expose his penis, but Ms. Smith would not give him what he wanted and she managed to leave the bathroom.

8.     By 2016, it was reflected in Ms. Smith's prison records that she had been raped by a guard while detained at Rikers Island.  When Ms. Smith moved to BHCF, she was housed for periods of time in areas for inmates with drug addiction and psychiatric issues, which were the inmates most victimized by prison guards.  She met Defendant Sergeant B when he was the regular supervisory sergeant on duty of one of her housing units.  Like Defendant Officer C, Defendant Sergeant B flirted with Ms. Smith, made lewd sexual comments and, on multiple occasions, tried to grab her from behind and pull her toward him.  After becoming friendly with Ms. Smith, on two occasions, Defendant Sergeant B asked her if she would expose her breasts to him while he masturbated in front of her.  She complied on both occasions and Defendant Sergeant B gave her a $100 bill each time.  Like Defendant Officer C, Defendant Sergeant B was also known within the BHCF population to have carried on an extended and open sexual relationship with at least one other inmate.

9.     This sexual harassment and grooming for more significant sexual exploitation continued for about a year until a particularly traumatic and vulnerable time for Ms. Smith in 2019, when she learned that her twin sister was in a coma, which was also known to the inmate population and prison staff.  During this period of two months in 2019, Ms. Smith was raped by Defendants Officer C and Sergeant B, forced to perform

6

oral sex on Defendant Officer C and sexually assaulted by Defendant Officer D, who inserted her finger in Ms. Smith's vagina.

10.     First, on April 9, 2019, Defendant Officer C forced Ms. Smith to give him oral sex while he was escorting her alone and while two other correction officers, Defendants Officer A and Officer B, kept watch.  After forcing her to give him oral sex, Defendant Officer C falsely reported that Ms. Smith had punched him**,** and Defendant Captain B oversaw a disciplinary hearing that pitted Ms. Smith's word against that of Defendant Officer C and his look out man, Defendant Officer A.  As a result of this disciplinary hearing, Defendant Captain B sentenced Ms. Smith to 60 days in solitary confinement, which she served in a special unit for inmates with significant mental health needs ("Therapeutic Behavioral Unit" or "TBU").

11.     While in the TBU, Ms. Smith believed she was safe from Defendant Officer C and decided not to report Defendant Officer C's unlawful conduct for fear of additional retaliation, a common occurrence for filing a grievance**.**  Ms. Smith's silence did her little good.  The TBU was another location where the inmates— because they suffered from psychiatric issues—were prime targets for routine sexual harassment and victimization.  It was also well known within the prison that the TBU is easy for prison staff to access.  While she was in the TBU, Defendant Officer C's good friend, Defendant Lieutenant A, used his supervisory position of authority as a lieutenant to torment Ms. Smith on Defendant Officer C's behalf, including by denying her food, clean sheets and medical care.

12.     On May 20, 2019, Defendant Lieutenant A allowed Defendant Officer C to enter the TBU, even though it was not an area in which he regularly worked,

and, in Defendant Lieutenant A's presence, harassed Ms. Smith by blowing her a kiss and

telling her that he loved her.  At that point, Ms. Smith realized that she was not safe in the

TBU, and Defendant Officer C was stalking her and could continue to hurt her.  Ms.

Smith then reported to Defendants Velez, Captain B, Captain A, Grievance Supervisor A

and Investigator A that Defendant Officer C forced her to give him oral sex and

continued to harass her.  Not one of them did anything to assist her, protect her or prevent

Defendant Officer C from having contact with her.  While Ms. Smith filed grievances

(more fully discussed below) about the sexual harassment that took place on May 20,

2019 and the sexual assault on April 9, 2019, DOCCS failed to investigate her complaints

or take any action to protect her from Defendant Officer C, and Defendants, on

information and belief, remain in their current positions.

13.     Just a couple of weeks after being sexually harassed by Defendant

Officer C, Ms. Smith was the victim of another coordinated sexual attack by DOCCS

guards.  On June 4, 2019, Ms. Smith argued with Defendant Officer D, who had tried to

handcuff her but was instructed by her superior not to do so and to back away from Ms.

Smith.  Later that day, after having been embarrassed by this incident with Ms. Smith,

Defendant Officer D, along with Defendants Unidentified Officer and Sergeant A and

another correction officer, escorted Ms. Smith in handcuffs and a waist chain to the

recreation yard.  While they were in the elevator, with Defendant Sergeant A standing

near the front of the elevator and Defendant Officer D, Defendant Unidentified Officer

and Ms. Smith standing at the back, Defendant Officer D suddenly accused her of hiding

contraband.  Ms. Smith believes that this accusation was in retaliation for the argument

between Defendant Officer D and Ms. Smith earlier that day.  Defendant Officer D then

8

shoved her ungloved hand into Ms. Smith's pants and dug her finger into Ms. Smith's vagina. She tried to squirm away, but Defendant Unidentified Officer pulled her back by her chain. Defendant Officer D then punched Ms. Smith twice in the face while Defendant Unidentified Officer restrained her. Defendant Sergeant A did nothing to intervene, despite his position of authority as a sergeant. Even though Ms. Smith asked for medical care immediately, several hours passed before Ms. Smith was examined, and Defendant Sergeant A never took photographs of her injuries despite having been instructed by a supervisor to do so.

14.     The very next day, Ms. Smith was upset that DOCCS staff had not taken pictures of her injuries or otherwise responded to the elevator assault. She reported to medical staff what had happened in the elevator. After reporting the elevator assault, she returned to her unit, where Defendant Sergeant B was on duty. As she was recovering from the assault, she experienced chest pains and shortness of breath. Defendant Sergeant B escorted Ms. Smith to the medical clinic along with another correction officer. The medical clinic was on the floor where Defendant Officer C regularly worked and was an area commonly used for sex between prison guards and inmates because of the large number of private locations and the lack of cameras. On their way to the clinic, Defendant Sergeant B saw Defendant Officer C, who accompanied the group to the medical clinic. After arriving in the clinic, Defendant Sergeant B instructed all but Defendant Officer C to leave.

15.     Once they were alone in the room with Ms. Smith, Defendants Sergeant B and Officer C each raped her (wearing condoms) while she was restrained on a clinic table. That night, Ms. Smith wrote a grievance about these rapes, and filed it

soon after, and she spent the next several days crying and requesting protective custody.

During this time, Ms. Smith was treated for mental decompensation—a deterioration in

her mental health—and she was anxious and restless.  Ms. Smith also reported the rapes

to medical and mental health staff, and to Defendants Velez, Captain A and Grievance

Supervisor A.  On information and belief, Defendants Velez, Captain A and Grievance

Supervisor A did nothing to help her and did not report the rapes to their supervisors or

otherwise ensure that a proper investigation was conducted.

16.     Ms. Smith then contacted attorneys at The Legal Aid Society, who

wrote two letters to Defendants Effman and Nunez setting forth in great detail Defendant

Officer C's forced oral sex on April 9, 2019 and his subsequent sexual harassment of Ms.

Smith while she was in the TBU on May 20, 2019; the sexually and physically abusive

"frisk" Ms. Smith endured on June 4, 2019; and the multiple rapes she suffered on June

5, 2019.  Defendants Effman and Nunez never responded to The Legal Aid Society's

letters, and, on information and belief, did not investigate Ms. Smith's claims prior to the

filing of this suit, beyond conducting one interview.

17.     Only on December 29, 2020, over a year and a half after Ms. Smith

filed her grievance regarding the forced oral sex by Defendant Officer C, did she receive

a decision that, according to DOCCS, this complaint was unsubstantiated without any

further explanation.  On information and belief, other than notification of this decision,

there has been no communication from DOCCS or OSI regarding the status of the

investigation into Ms. Smith's multiple allegations of abuse.  However, after Ms. Smith

retained Cravath, Swaine & Moore LLP ("Cravath") as counsel in this matter, she was

transferred through an administrative draft to Albion Correctional Facility, which

10

deprived her of access to the special drug treatment program at BHCF.  On information

and belief, Ms. Smith was transferred to separate her from the BHCF correctional staff

named in this complaint.

18.     Since Ms. Smith retained Cravath, counsel from Cravath have

attempted to obtain information related to her claims by, among other things, filing

several FOIL requests, offering on two occasions to speak with DOCCS counsel about

the evidence supporting Ms. Smith's claims and seeking information on the status of the

DOCCS's investigation of her claims.  Before the filing of this suit in February 2021,

Cravath received no response to its several attempts to discuss Ms. Smith's allegations

with DOCCS.  In a final effort to speak with DOCCS counsel and investigate Ms.

Smith's claims, six days prior to filing this action, Cravath sent another letter requesting a

conversation with DOCCS regarding Ms. Smith's claims; however, DOCCS did not

respond to that letter either.

19.     Accordingly, Ms. Smith and Ms. Doe seek to vindicate their

constitutional rights through this action.

### PARTIES

20.     Plaintiffs were, at all relevant times, female inmates under the

direct control and supervision of DOCCS, its agents and officials, who were responsible

for their care and safety.

21.     Ms. Smith has been recently released from DOCCS custody.

During the relevant time period, she was housed at BHCF.  Ms. Doe is currently housed

at Taconic Correctional Facility.  During the relevant time period, she was housed at

BHCF.

11

22.     Defendant Anthony J. Annucci was at all relevant times the Acting
Commissioner of DOCCS and responsible for enacting policies and procedures to protect
the safety of individuals housed in DOCCS facilities and ensuring the enforcement of
DOCCS policies and practices.  Defendant Annucci is sued herein in his individual
capacity.

23.     Defendant Jason Effman was at all relevant times the Associate
Commissioner and Prison Rape Elimination Act ("PREA") Coordinator for DOCCS and
was responsible for developing, implementing and overseeing DOCCS's compliance with
PREA standards in its facilities.  Defendant Effman is sued herein in his individual
capacity.

24.     Defendant Steven Maher was at all relevant times the Chief of
Investigations for the DOCCS's OSI (previously known as the Office of the Inspector
General).  He is responsible for the investigation of complaints of criminal misconduct or
violations of Departmental rules by DOCCS employees, including complaints of sexual
harassment and abuse; for determining the standards by which such complaints are
assessed; for reviewing all investigations of such complaints; for determining whether
such complaints are substantiated; and for  recommending whether or not responsive
action be taken, including referrals to the Bureau of Labor Relations ("BLR") for
disciplinary action against staff and referrals of allegations of criminal misconduct to law
enforcement officials.  Defendant Maher is sued herein in his individual capacity.

25.     Defendant Christian Nunez was at all relevant times the Deputy
Chief of the Sex Crimes Unit for DOCCS's OSI.  He is responsible for the investigation
of complaints of criminal or departmental misconduct by DOCCS employees, including

complaints of sexual harassment and abuse; for determining the standards by which such complaints are assessed; for reviewing all investigations of such complaints; for determining whether such complaints are substantiated; and for recommending whether or not responsive action should be taken, including referrals to the BLR for disciplinary action against staff and referrals of allegations of criminal misconduct to law enforcement officials.  Defendant Nunez is sued herein in his individual capacity.

26.     Defendant John Shipley was at all relevant times the Director of DOCCS's BLR.  He is responsible for deciding whether and on what terms to pursue disciplinary actions against DOCCS staff who are alleged to have violated DOCCS rules and regulations, including violations consisting of the commission of sexual misconduct. He is responsible for determining the type, scope and manner concerning how evidence will be offered by DOCCS at disciplinary hearings of staff.  Defendant Shipley is sued herein in his individual capacity.

27.     Defendant Sabina Kaplan was at all relevant times the Superintendent of BHCF.  She was at all relevant times responsible for the assignment and removal of staff; the training of staff; the supervision of staff and inmates to ensure a safe environment; the enforcement of DOCCS's rules and regulations related to inmate safety; the housing assignment of inmates within the facility; the review of decisions to place prisoners in punitive or administrative segregation; the investigation of and response to complaints of misconduct against staff, in conjunction with OSI; and the establishment of policies and practices regarding sexual contact and conduct between staff and inmates.  Defendant Kaplan was also at all relevant times the supervisor of Defendants Daye, Velez, Captain A, Captain B, Lieutenant A, Sergeant A, Sergeant B,

Officer A, Officer B, Officer C, Officer D, Officer E, Unidentified Officer, Grievance Supervisor A and Investigator A.  Defendant Kaplan is sued herein in her individual capacity.

28.     Defendant Michael Daye was at all relevant times the Deputy Superintendent for Security at Bedford, and was responsible for the training and supervision of staff and inmates to ensure a safe environment, including the enforcement of  DOCCS's rules and regulations; the investigation of and response to complaints of misconduct against staff, in conjunction with OSI; decisions concerning the assignment of staff, including whether to remove staff from contact with prisoners; decisions concerning the assignment of inmates, including whether to remove inmates from contact with certain staff; and for establishing and/or enforcing the customs and practices with regard to sexual contact and conduct between employees and inmates at BHCF. Defendant Daye is sued herein in his individual capacity.

29.     Defendant Elaine Velez was at all relevant times the Assistant Deputy Superintendent at BHCF and the PREA Compliance Manager.  She was responsible for overseeing and assessing PREA compliance efforts within BHCF, maintaining documentation as required under the PREA standards and coordinating with Defendant Effman regarding PREA matters within BHCF.  Defendant Velez was also at all relevant times the supervisor of Defendants Captain A, Captain B, Lieutenant A, Sergeant A, Sergeant B, Officer A, Officer B, Officer C, Officer D, Officer E, Unidentified Officer, Grievance Supervisor A and Investigator A.  Defendant Velez is sued herein in her individual capacity.

30.     Defendants Captain A and Captain B were at all relevant times Captains at BHCF.  Supervisory staff are trained in PREA policy and the procedures at BHCF that direct them to report immediately and investigate, as directed, any allegations regarding violations of PREA policy by any inmate or staff member assigned at the facility.  These responsibilities include determining any imminent threat of safety to an inmate who makes an allegation.  They have major institutional responsibilities such as security audits, inspections, perimeter security, investigations, grievance policy appeals, personnel actions such as appraisals and discipline, shift assignments, inmate housing, among others.  Their primary responsibility is to oversee and implement DOCCS policy, BHCF Standard Operating Procedures and all applicable federal and state laws. Defendants Captain A and Captain B were also at all relevant times the supervisors of Defendants Lieutenant A, Sergeant A, Sergeant B, Officer A, Officer B, Officer C, Officer D, Officer E, Unidentified Officer, Grievance Supervisor A and Investigator A. Defendants Captain A and Captain B are sued herein in their individual capacities.

31.     Defendant Lieutenant A was at all relevant times a Lieutenant at BHCF.  Supervisory staff are trained in PREA policy and the procedures at BHCF that direct them to report immediately and investigate, as directed, any allegations regarding violations of PREA policy by any inmate or staff member assigned at the facility.  These responsibilities include determining any imminent threat of safety to an inmate who makes an allegation.  He was responsible for monitoring the activities of sergeants and correction officers, including ensuring that correction officers were in their assigned areas; and ensuring that sergeants and correction officers follow policies and directives. Defendant Lieutenant A was also at all relevant times the supervisor of Defendants

15

Sergeant A, Sergeant B, Officer A, Officer B, Officer C, Officer D, Officer E, Unidentified Officer, Grievance Supervisor A and Investigator A.  Defendant Lieutenant A is sued herein in his individual capacity.

32.     Defendants Sergeant A and Sergeant B were at all relevant times Sergeants at BHCF.  Supervisory staff are trained in PREA policy and the procedures at BHCF that direct them to report immediately and investigate, as directed, any allegations regarding violations of PREA policy by any offender or staff member assigned at the facility.  These responsibilities include determining any imminent threat of safety to an inmate who makes an allegation.  They were responsible for monitoring the activities of correction officers, including ensuring that correction officers were in their assigned areas; and ensuring that correction officers follow policies and directives.  Defendants Sergeant A and Sergeant B were also at all relevant times the supervisors of Defendants Officer A, Officer B, Officer C, Officer D, Officer E, Unidentified Officer, Grievance Supervisor A and Investigator A.  Defendants Sergeant A and Sergeant B are sued herein in their individual capacities.

33.     Defendants Officer A, Officer B, Officer C, Officer D, Officer E and Unidentified Officer were at all relevant times Correction Officers at BHCF.  Defendants Officer A, Officer B, Officer C, Officer D, Officer E and Unidentified Officer's duties included supervising and ensuring the safety of inmates at BHCF.  Defendants Officer A, Officer B, Officer C, Officer D, Officer E and Unidentified Officer are sued herein in their individual capacities.

34.     Defendant Grievance Supervisor A was at all relevant times a Grievance Supervisor at BHCF whose duties included reporting complaints of

16

misconduct against prison staff.  Defendant Grievance Supervisor A is sued herein in his

individual capacity.

35.     Defendant Investigator A was at all relevant times an investigator

at DOCCS's OSI.  Defendant Investigator A's duties included investigating, among other

things, allegations of sexual misconduct within BHCF.  Defendant Investigator A is sued

herein in her individual capacity.

## JURISDICTION AND VENUE

36.     This Court has subject-matter jurisdiction over Plaintiffs' claims

under 28 U.S.C. §§ 1331 and 1343(a).  This Court has jurisdiction to award nominal,

compensatory and punitive damages and attorneys' fees under 28 U.S.C. § 2201 and

42 U.S.C. §§ 1983 and 1988.

37.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the

events giving rise to Plaintiffs' claims occurred within BHCF in Bedford Hills, New

York, which is in the Southern District of New York.

## RELEVANT FACTS

**A.     History of Sexual Abuse of Women Incarcerated in New York State Prisons.**

38.     BHCF is a maximum-security, all-women's prison operated by

DOCCS and located in Bedford Hills, New York.

39.     Prisoners at BHCF, like many prisoners in this country, are at risk

of sexual abuse from prison staff, the vast majority of whom are men.  An even greater

proportion of the supervisory staff is men.  Notably, BHCF has among the highest rate of

allegations of sexual victimization relative to the other DOCCS facilities.[4]   DOCCS

reported in its May 2020 "Annual Report on Sexual Victimization 2013-2017" that, of all

the allegations of sexual victimization reported within DOCCS facilities, 22 took place at

BHCF in 2013, 40 in 2014, 39 in 2015, 33 in 2016 and 21 in 2017.[5]  At BHCF alone,

from 2009 to 2017 there were criminal charges of rape filed against nine different

corrections staff members.[6]

        40.    It is well known among the prison population at BHCF that

corrections staff regularly flirt with, make lewd sexual comments to, proposition and

engage in sexual activity with women inmates.  Flirtation and sexual comments often

occur with impunity in the presence of other inmates and supervisory staff.  Inmates and

prison supervisors also know that this conduct regularly leads to sexual activity between

corrections staff and inmates in any of the many locations where corrections staff can be

alone and off camera with inmates.

        41.    Moreover, inmates at BHCF know that if they file grievances

against prison staff, they routinely face retaliation by prison staff.[7]

---

[4]DOCCS, *2013-2017 Report*, *supra* note 3.

[5]*Id.*

[6]*See infra* ¶ 129.

[7]"Perhaps the most problematic factor in the grievance process is the retaliation experienced by incarcerated people who speak out against issues and abuses.  Fifty one percent of respondents to the post-visit survey at Bedford Hills reported they had faced retaliation or discipline for filing a grievance in the past."  Correctional Ass'n of N.Y., *It Reminds Us How We Got Here:  (Re)producing Abuse, Neglect, and Trauma in New York's Prisons for Women*, 29, https://static1.squarespace.com/static/5b2c07e2a9e02851fb387477/t/5f99be40b24f796db9b31cfa/16039112 42679/CANY_WomensReport-Full_F.pdf.

42.     Because of the risk and incidence of sexual abuse and retaliation in prison settings,[8] the federal government, the District of Columbia and all 50 states[9] have enacted statutes criminalizing any sexual contact between prisoners and correctional staff.  *See, e.g.*, N.Y. Penal Law § 130.05(3)(e).  Awareness of the risk of custodial sexual abuse led to the enactment of the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.* (2003).

43.     Female prisoners are a particularly vulnerable population and face a heightened risk of sexual abuse by male officers.[10]  As many as 60 percent to 80 percent of women prisoners have been physically or sexually abused prior to their incarceration.[11]  According to a study performed at BHCF, a substantial majority of the women incarcerated in general population at BHCF reported having experienced sexual

---

[8]"More than 80,000 prisoners each year are sexually victimized during incarceration, but only about 8% report victimization to correctional authorities."  Sheryl P. Kubiak et al., *Sexual Misconduct in Prison: What Factors Affect Whether Incarcerated Women Will Report Abuses Committed by Prison Staff?*, 41 Law and Hum. Behav. 361, 361 (2017).

[9]National Prison Rape Elimination Commission, *National Prison Rape Elimination Commission Report*, 37 (June 2009), https://www.ncjrs.gov/pdffiles1/226680.pdf.

[10]Kubiak et al., *supra* note 8, at 362 ("[I]ncarcerated women are sexually victimized at a higher rate than incarcerated men.").

[11]Allison Hastings et al., *Keeping Vulnerable Populations Safe Under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, 12 (April 2015), https://www.vera.org/downloads/publications/housing-vulnerable-populations-prea-guide-april-final.pdf ("[W]omen in the criminal justice system report more extensive victimization Histories—including lifetime histories of sexual and physical abuse—than women who have not been incarcerated or men who have been incarcerated.  In one study of women in . . . a maximum security prison, more than half (59 percent) of women reported childhood sexual molestation, and 77 percent reported lifetime physical or sexual assaults by non–intimates."); *see also* U.S. Dep't of Just., Bureau of Just. Stat., *Prior Abuse Reported by Inmates and Probationers*, 1 (1999), http://www.bjs.gov/content/pub/pdf/parip.pdf (57.2 percent of females report abuse before admission to state prison versus 16.1 percent of males. 39.0 percent of female state prison inmates report that they were sexually abused before admission to state prison versus 5.8 percent of males).

abuse or severe violence prior to incarceration.[12]  These abuse histories make inmates especially vulnerable to coercion and manipulation.[13]

44.     Sexual abuse by staff within DOCCS facilities is pervasive and widely known within prison communities, but because prisons are outside of the purview of the general population and the victims do not attract the same sympathy as women who are not convicts, this widespread problem is largely overlooked.  In its 2020 Report, DOCCS reported that OSI received 277 complaints of staff-on-inmate sexual abuse and harassment in 2013, 387 such complaints in 2014, 440 such complaints in 2015, 336 such complaints in 2016, 296 such complaints in 2017 and 400 such complaints in 2018.[14]

45.     A 2014 Bureau of Justice Statistics report on a survey of prisoners at prisons around the country found that five of the seven DOCCS prisons surveyed reported staff sexual misconduct rates above the national average.[15]

---

[12]Angela Browne et al., *Prevalence and Severity of Lifetime Physical and Sexual Victimization Among Incarcerated Women*, 22 Int'l. J. of L. and Psych. 301, 312-316 (1999).

[13]A 2013 report from the Department of Justice's ("DOJ") Bureau of Justice Statistics states that "[i]nmates who experienced sexual victimization before coming to the facility were also more likely than inmates with no sexual victimization history to report incidents of sexual victimization involving other inmates and staff."  U.S. Dep't of Just., Bureau of Just. Stat., *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12*, 19 (May 2013), http://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.

[14]DOCCS, *2013-2017 Report*, *supra* note 3, at 3, Appendix E; *see also* U.S. Dep't of Just., Bureau of Just. Stat., *Survey of Sexual Violence in Adult Correctional Facilities 2009–2011*, at 7-12 (Jan. 2014), http://www.bjs.gov/content/pub/pdf/ssvacf0911st.pdf [hereinafter U.S. Dep't of Just., *2009-2011 Survey*] (in prisons located in New York, there were 184 allegations of staff sexual misconduct and 24 allegations of staff sexual harassment in 2011; in 2010, 168 allegations of staff sexual misconduct and 65 of staff sexual harassment; and in 2009, 173 allegations of staff sexual misconduct and 38 of staff sexual harassment).

[15]David Reutter, *Staff-on-Prisoner Sexual Abuse Persists in New York Prisons*, Prison Legal News (Feb. 3, 2016), http://www.prisonlegalnews.org/news/2016/feb/3/staff-prisoner-sexual-abuse-persists-new-york-prisons/.

46.     There were at least seven pregnancies of DOCCS inmates conceived with DOCCS staff between 2000 and 2013, the last year for which data has been published.[16]

47.     There have been years in the recent past when DOCCS's OSI has received approximately 200 complaints of staff sexual misconduct involving inmates.[17] In 2010, according to PREA surveys, three of the eleven prisons in the U.S. with the most staff-on-inmate sexual violence were in New York.[18]  In 2011, the Review Panel on Prison Rape invited three "high incidence" prisons to appear at its hearings, one of which was a DOCCS facility.[19]  One of the experts testifying on this panel found that all of the women's facilities in DOCCS have high rates of staff-on-inmate sexual abuse.[20]

48.     Female prisoners are disproportionately victims of staff sexual misconduct in DOCCS prisons and women known to have intellectual disabilities or psychiatric conditions are the most victimized because DOCCS staff count on these women being perceived as not credible.  According to DOCCS records from 2007 to 2012, women were involved in 30% of sexual misconduct cases and 61% of sexual harassment cases, despite only accounting for 5% of all state prisoners.[21]

---

[16]Alysia Santo, *Raped Behind Bars*, Albany Times Union (Sept. 9, 2013), http://www.timesunion.com/local/article/raped-behind-bars-4795883.php#page-1 ("Prison officials say there have been seven pregnancies since 2000 in which the father of the inmate's child was a staff member from the facility."); *see also* Reutter, *supra* note 15.
[17]U.S. Dep't of Just., *2009-2011 Survey, supra* note 14.
[18]Eli Hager, *Trust Nobody, and Proceed with Caution*, The Marshall Project (Feb. 20, 2015), https://www.themarshallproject.org/2015/02/20/trust-nobody-and-proceed-with-caution; *see also* U.S. Dep't of Just., Bureau of Just. Stat., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09*, 9 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf.
[19]G. J. Mazza, U.S. Dep't of Just., *Report on Sexual Victimization in Prisons and Jails*, ii (April 2012), https://www.ojp.gov/sites/g/files/xyckuh241/files/media/document/prea_finalreport_2012.pdf.
[20]*Id.* at 43.
[21]Reutter, *supra* note 15.

**B.      Plaintiffs Were at High Risk of Sexual Assault Upon Entering BHCF.**

49.      In enacting PREA in 2003, Congress found that "[e]xperts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison.  Many inmates have suffered repeated assaults."[22] Congress further found that "[i]nmates with mental illness are at increased risk of sexual victimization".[23]

50.      To address these and other concerns, Congress established a commission, known as the National Prison Rape Elimination Commission, tasked with developing a set of recommended national standards for enhancing the detection, prevention, reduction, and punishment of prison rape.

51.      Those standards, known as the National PREA Standards, were published in 2009 and were provided to the U.S. Department of Justice for review and passage as a final rule.  That final rule became effective August 20, 2012.[24]

52.      Under the National PREA Standards, inmates are supposed to be screened during intake, during the initial classification process and at all subsequent classification reviews to assess their risk of being sexually abused.[25]Among the factors prison staff screening for risk of sexual victimization must consider are whether the inmate has a mental or physical disability, the physical build of an inmate, prior sexual victimization and the inmate's own perception of vulnerability.[26]

---

[22]34 U.S.C. § 30301.
[23]*Id*.
[24]U.S. Dep't of Just., *Implementing the PREA Standards, Protecting Inmates, and Safeguarding Communities*, 5, https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/BJA-2008-1720.PDF.
[25]28 C.F.R. § 115.41.
[26]*Id.*

53.     Based on the PREA Standards and basic common sense, Ms. Smith was at a high risk for sexual assault from the moment she entered BHCF, which was known to staff who had access to records detailing her prior history or spoke about her criminal record as a prostitute.  Ms. Smith is a small woman, standing only 4'11", and she has diminished cognitive abilities.  She repeated both the second grade and the ninth grade because of her difficulties in school and did not ultimately graduate high school.

54.     Ms. Smith also has a long and well-documented history of exploitative sexual relationships both in and out of prison.  She was born inside a correctional facility to a crack-cocaine-addicted mother and was adopted along with her twin sister not long after their birth.  Ms. Smith's life was upturned by her adopted parents' divorce.  She ran away from home at 13 years of age and was found by an older man who bought her clothes, earned her trust and ultimately forced her into prostitution. Ms. Smith's adoptive family was unable to locate her, and the older man did not allow her to leave.  She was trapped with this man for about a year, during which time she began cutting herself and drinking heavily.  Ms. Smith eventually escaped from this man but became accustomed to living on the streets and surviving in the sex trade.  Ms. Smith spent the next several years in and out of jail, principally on prostitution and drug-possession charges.

55.     While Ms. Smith was housed at Rikers Island awaiting trial for the offense for which she is now serving time, she was repeatedly raped, sexually abused and threatened by a correction officer.  Ms. Smith frequently told her therapists and mental health professionals at BHCF that she suffered nightmares and flashbacks from the rapes that occurred at Rikers Island, which was reflected in her prison "Core History" form and

23

her medical records.  She has needed to adjust medications to address and quell the disturbing nightmares and other symptoms she experiences as a result of that sexual abuse.

56.     Like many incarcerated women in DOCCS custody,[27] Ms. Smith also has a history of serious mental health disorders, suffering from multiple diagnoses. At age 17, Ms. Smith was admitted to a hospital and placed on antipsychotic and mood stabilizing medication.  About a year later, she was admitted again to another hospital, where she stayed for about a month and was placed on new antipsychotic and mood stabilizing medication.  She was admitted to two more hospitals after that.

57.     While at Rikers Island awaiting trial, from 2011 to 2015, Ms. Smith was diagnosed with and treated for various mental health disorders.  Her mental health and medical records from Rikers Island reveal that her intellectual functioning was consistently categorized as "low".

58.     Upon entering BHCF, Ms. Smith was likewise diagnosed with a "Serious Mental Illness"—Schizoaffective Disorder—and was identified as needing Level 1 mental health services, which meant she needed to be housed in a facility with dedicated Office of Mental Health staff who are able to provide treatment to inmate-patients with major mental disorders.  She continues to receive regular mental health treatment, including therapy and medication, to this day.

---

[27]"Over half of women in NY prisons are diagnosed with mental health conditions by the Office of Mental Health (OMH)", and "[n]early one third (31%) of these women are in the highest severity categories (OMH Levels 1, 1S, 2, 2S)."  Correctional Ass'n of N.Y., *Fact Sheet, Women's Incarceration: the experience in New York's prisons* (2019), https://static1.squarespace.com/static/5b2c07e2a9e02851fb387477/t/5cc08885fa0d60251a568084/1556121 734338/2019+Women%27s+Incarceration+Fact+Sheet.pdf.

59.     Ms. Smith was also identified as a rape victim while at Rikers Island and her criminal record identified her prior involvement in prostitution.  Her criminal history was known to inmates and prison guards.  Each is a risk factor for sexual assault in prison.

60.     Ms. Doe similarly has a long history of being sexually abused and exploited.  Her mother was in and out of prison, so Ms. Doe first lived with other relatives and was then placed in foster care as a child.  She ran away from a group home at the age of thirteen and met a man who said that he would help her achieve her dream of becoming a choreographer, but instead forced her into stripping.  At the age of fourteen, she was raped at an acquaintance's home by multiple men, at gunpoint, and became pregnant.  Ms. Doe was then sold to a sex trafficking ring run by a woman who took all the money Ms. Doe earned from stripping.

61.     While stripping, Ms. Doe met a pimp who stalked her from club to club, until he was eventually able to force her to work for him as a stripper, and ultimately, as a prostitute.  Not long after she began working as a prostitute, she got into the car of a police officer, and she was arrested for prostitution and sent to juvenile detention until she was 17.

62.     When Ms. Doe was released from juvenile detention, she went to live with her son at her mother's house.  While she was there, her mother's boyfriend tried to rape her.  Ms. Doe told her mother what had happened, and her mother kicked her out of the house.  She was back on the streets after that.

### C.     Defendant Sergeant B Sexually Harassed Ms. Smith Throughout Her Time at BHCF.

63.     Ms. Smith first encountered Defendant Sergeant B when she was assigned to the housing unit where he regularly served as the sergeant on duty. Defendant Sergeant B was notorious among the prison population for openly flirting with and making sexual comments to inmates.  He was also known for having had at least one extended sexual relationship with an inmate.  To the extent any formal discipline resulted from that relationship, it did not prevent Defendant Sergeant B from continuing to engage in sexual misconduct.

64.     At first, Defendant Sergeant B told Ms. Smith that she looked pretty and made comments teeming with sexual innuendo, like "You know I like Black girls" and "You know what I want".  Defendant Sergeant B would also ask Ms. Smith if she "needed anything", and if Ms. Smith had a disagreement or dispute with other inmates, Defendant Sergeant B would have them moved or disciplined.

65.     At various times, Defendant Sergeant B told Ms. Smith that if he helped her, she would need to help him.  On several occasions, Defendant Sergeant B tried to grab Ms. Smith from behind and pull her to him.  If she tried to walk away from Defendant Sergeant B when they were speaking and before he felt the conversation was over, he would grab her and demand, "Where are you going?", in a manner that indicated he was upset and felt disrespected.

66. In 2018, Defendant Sergeant B twice cornered Ms. Smith and asked to see her breasts while he masturbated. In the first incident, Defendant Sergeant B pulled Ms. Smith into a room while she was in the mess hall, closed the door and told her he had missed her. He then asked to see her breasts while he masturbated. After he ejaculated, he wiped himself with his shirt and gave Ms. Smith a hundred-dollar bill. The second incident proceeded similarly, with Defendant Sergeant B again asking to see Ms. Smith's breasts while he masturbated and again giving her a hundred-dollar bill after he finished.

### D. Defendant Sergeant B Forced Ms. Doe To Perform Oral Sex.

67. Not long after Defendant Sergeant B engaged in sexual misconduct with Ms. Smith, he similarly assaulted Ms. Doe. In late winter or early spring 2019, Ms. Doe was cleaning the men's bathroom in the school building as part of her assigned job. Defendant Officer E was in the hallway outside the bathroom but there was no other inmate or officer in the bathroom with her. While she was cleaning, Defendant Sergeant B entered the bathroom. Ms. Doe called out that she was in there cleaning. Rather than leave Ms. Doe to complete her work, Defendant Sergeant B instead blocked the exit and made sexually suggestive comments, such as "I've never had a Black girl before." When Ms. Doe tried to move past him to the door, Defendant Sergeant B punched her in the stomach so hard that she fell to the floor and lost her breath.

68. While Ms. Doe was on the ground, Defendant Sergeant B exposed himself and made clear that he expected Ms. Doe to perform oral sex. He threatened her during the encounter, saying that if she refused to do as he asked, he would create problems for her in prison and upon her release from BHCF. Fearing what Defendant

Sergeant B would do, Ms. Doe complied.  He held her head as he was ejaculating, thereby forcing her to swallow his semen.

69.     Afterwards, Ms. Doe left the bathroom and saw Defendant Officer E sitting at his desk in area outside the bathroom.  She was visibly upset, and she asked Defendant Officer E if she could return to her unit.  He smirked knowingly and said she could.  Still afraid of what Defendant Sergeant B could do to her and knowing that it was her word against a sergeant's, she decided the safest thing to do was to stay quiet, so she did not report the incident.

**E.     Defendant Officer C Forced Ms. Smith To Perform Oral Sex on Him with the Help of Defendants Officer B and Officer A.**

70.     During the course of Ms. Smith's incarceration at BHCF, Defendant Officer C, like Defendant Sergeant B, began by "grooming" her for sexual contact.  Defendant Officer C was notorious among the prison population for being physically aggressive and carrying on an extended sexual relationship with at least one inmate and flirting and sexually harassing others.

71.     Shortly after Ms. Smith arrived at BHCF, Defendant Officer C began seeing her regularly in the medical clinic, where she went daily for her psychiatric prescriptions.  Initially, Defendant Officer C's sexual harassment seemed like "aggressive" flirting:  he told Ms. Smith she was beautiful and asked her whether she "had a man".  This escalated to Defendant Officer C telling her "you're going to be mine someday" or "I'm going to get you one day".  On several occasions, Defendant Officer C removed Ms. Smith from the medication line and told her to go last, which gave him the opportunity to give her candy after she had received her medication.  On one occasion,

Defendant Officer C gave Ms. Smith a small bag of marijuana and, at another time, Defendant Officer C allowed her to pass tobacco and rolling papers to another inmate, in violation of the prison rules.

72.     While Defendant Officer C became more and more aggressive in his effort to get Ms. Smith to engage in sexual activity, Ms. Smith continued to rebuff him.  Defendant Officer C then seized on an opportunity in the medical clinic when she went into the bathroom.  Once she was inside, Defendant Officer C followed her, claiming that he suspected she had contraband.  After entering the bathroom, Defendant Officer C blocked the door and began to remove his penis from his pants, at which point Ms. Smith told him she was not going to have sex with him.  She managed to leave the bathroom but was startled at how aggressive he had become.  Defendant Officer C covered up the commotion by informing the other officers in the bullpen/medication area that he had followed Ms. Smith into the bathroom because he had believed that she had been hiding contraband.

73.     On April 9, 2019, Defendant Officer C decided he was no longer willing to take "no" for an answer.  That evening, Ms. Smith went to the package room to retrieve a wrist watch that had been mailed to her.  Because inmates are allowed only one wrist watch, she was required to relinquish the watch that she already had.  The package room attendant denied Ms. Smith's exchange because the attendant believed the watch she was exchanging was not the watch she had had when she entered BHCF.  Ms. Smith became upset and she and the package room attendant got into a verbal altercation that escalated to the point that Ms. Smith was ordered to step outside of the package room.

29

74.     At the time of the argument, Defendant Officer C was in the rear of the package room, though that was not his assigned post.  He emerged from the package room, yelled in front of other inmates that he was going to "whoop [her] ass", commanded Ms. Smith to face the wall and then aggressively took her out of the room. Knowing Ms. Smith was in a compromised state and at risk of disciplinary action for the package room altercation, after Defendant Officer C had Ms. Smith outside of the package room, while she was walking in front of him, he told her to stop and turn around. When Ms. Smith turned around, she saw that Defendant Officer C had exposed his penis, which had a condom on it.  Defendant Officer C then demanded that Ms. Smith give him oral sex.

75.     Defendant Officer C threatened to "choke the shit out of [her]" if she screamed or resisted.  Ms. Smith performed oral sex on Defendant Officer C until he ejaculated into the condom.  She saw no one walk past during this time and Ms. Smith believes this area was not covered by facility cameras.

76.     After he ejaculated, Defendant Officer C zipped his pants up and led Ms. Smith up a hill to an area where Defendant Officer B and Defendant Officer A were standing.

77.     Defendants Officer C, Officer B and Officer A shook hands with each other.  Defendants Officer B and Officer A told Defendant Officer C they had been "holding it down"; so it became evident to Ms. Smith that Defendants Officer B and Officer A had been on the "lookout" to ensure no one else walked by while Defendant Officer C forced Ms. Smith to perform oral sex.

78.     Ms. Smith became upset that she had just been sexually assaulted and was now being forced to stand around and wait silently while her abuser joked with the two men who had helped him.  In her exasperation, Ms. Smith walked away from the three Defendants.  Defendant Officer C said to Ms. Smith, "Don't fucking move.  You fucking heard me", but she kept walking.  Defendant Officer C then came running after her and hit her on her face and elsewhere.

79.     Ms. Smith managed to run toward a fence, where others would be able to see her.  Defendant Officer C dragged her down the stairs and handcuffed her.

80.     Defendant Officer C's body camera was turned off throughout this incident.

81.     After the incidents on April 9, the package room attendant filed an Inmate Misbehavior Report regarding her dispute with Ms. Smith in the package room. Defendants Officer C and Officer A also initiated disciplinary proceedings against Ms. Smith, with both men claiming that Ms. Smith had hit Defendant Officer C in the chest while she was being escorted from the package room.  This allegation was false: Defendant Officer C is a large man, and Ms. Smith—not even five feet tall—had no interest in getting into a physical altercation with him.

82.     Nevertheless, prison officials held disciplinary hearings on the incidents.  The allegation that Ms. Smith had hit Defendant Officer C in the chest came down to a credibility assessment between the correction officers and Ms. Smith because Defendant Officer C was not wearing a body camera and there were no other cameras in the vicinity.

83.     As a result of her alleged misbehavior, Ms. Smith was sentenced to serve 60 days in the Special Housing Unit ("SHU").  Because of Ms. Smith's mental health history, she was required to serve disciplinary sentence time in the TBU.

84.     While in the TBU, Ms. Smith was denied food, clean sheets and medical care for chest pains by Defendant Lieutenant A, a lieutenant, who was known to be good friends with Defendant Officer C.  On May 17, 2019, BHCF medical professionals recommended that Ms. Smith be removed from her cell for medical care, but because she had been denied food and medical attention, she was too weak to even stand.  Another officer then handcuffed her, as is required before transportation out of the cell, but the officer never took Ms. Smith to receive medical care.  As a result, Ms. Smith remained weak, sick and handcuffed in her own cell.

**F.     Defendant Officer C Was Allowed to Interact with Ms. Smith and Continued to Sexually Harass Her with the Knowledge of Defendants Velez, Captain A, Captain B, Lieutenant A, Grievance Supervisor A and Investigator A.**

85.     Although Ms. Smith was suffering in the TBU, she at least felt safe from Defendant Officer C's aggression and sexual demands.

86.     She decided not to report the sexual assault of April 9, 2019 immediately because she feared further retaliation from other officers, as had occurred in the sham disciplinary hearing that led to her placement in the TBU.  She mistakenly assumed that Defendant Officer C could not harm her while she was in the TBU.

87.     On the evening of May 20, 2019, however, Defendant Lieutenant A allowed Defendant Officer C to enter the TBU, even though he did not work in that unit and seemingly had no reason to be there.

32

88.     Defendant Officer C located Ms. Smith in her cell and told her he was not mad at her and that he loved her, but that he was not done with her.  He then blew her a kiss.  He appeared to be intoxicated.

89.     Although Ms. Smith remained afraid of what would happen if she reported Defendant Officer C, she realized that if Defendant Officer C could access her in the TBU, she was not safe.

90.     The next day, Ms. Smith told Defendant Captain B—a captain at BHCF—that Defendant Officer C had forced her to give him oral sex, and she filed official grievances about the sexual harassment that took place on May 20, 2019, and the sexual assault on April 9, 2019.  In her grievances, she desperately pleaded for help and protection, stating that Officer C wanted to force himself on her again, that he would not leave her alone and that she was not safe.  She pleaded that her case be reported to Prisoner Rights.  In one grievance, Ms. Smith wrote that she "jump[ed]" when she heard Defendant Officer C's voice in the TBU, and she did "not want to see his eyes[] look at me" the way he had on "April 8 by [the] package room when he force[d] me to give oral sex".[28]  This grievance was reviewed by Defendant Grievance Supervisor A, and sent to Defendants Velez and Captain A.

91.     In another grievance, also dated May 21, 2019, Ms. Smith wrote that Defendant Lieutenant A "got Defendant Officer C to come to [the] TBU", and Defendant Officer C blew her a kiss and said he still loved her.  The grievance states that Defendant Lieutenant A was "smiling" and that Defendant Officer C "wants to force me

[28]While Ms. Smith wrote April 8 in her complaint, it is our understanding that the incident actually took place on April 9, 2019.

33

again.  He came to let me know he is not done with me. . . . He will have his way again.
Lieutenant A is on his side."[29]

92.     In a third inmate grievance from May 21, 2019, Ms. Smith
explained that Defendant Lieutenant A is "doing police brutality and retaliation due to
good pal Officer C".

93.     In addition to filing grievances and informing Defendant Captain
B, Ms. Smith reported Defendant Officer C's behavior separately to Defendant Velez
(assistant deputy superintendent and manager of BHCF's PREA compliance), and sent a
letter regarding Defendant Officer C's conduct to Defendant Captain A.

94.     Ms. Smith also told Defendant Grievance Supervisor A that she
was afraid of Defendant Officer C and that he was not "done with her" yet.

95.     Ms. Smith's adoptive mother also called DOCCS twice and made
complaints about the oral sex assault, sexual harassment and the rapes, stating that Ms.
Smith needed to speak with someone about what had happened to her.  After this,
Lieutenant C spoke with Ms. Smith and took down her statement.  Ms. Smith never heard
anything more from Lieutenant C regarding these incidents.

96.     Ms. Smith also spoke with Defendant Investigator A about
Defendant Officer C's demand for oral sex on April 9, 2019, and his statements to her on
May 20, 2019.  Defendant Investigator A informed Ms. Smith that she would investigate
the incident and look at whatever camera footage might be available.  Ms. Smith heard
nothing from Defendant Investigator A regarding the status of any investigation; only

---

[29]Ms. Smith wrote a name similar to Defendant Lieutenant A's name in her grievances, but she was
referring to Defendant Lieutenant A.

over a year and a half later did she receive notice that her claim was found to be unsubstantiated, with no further explanation.  To Ms. Smith's knowledge, no one performed an appropriate investigation.

97.   Despite having reported Defendant Officer C's conduct to DOCCS supervisors, Ms. Smith was not kept separated from Defendant Officer C.  He continued to interact with her, though Ms. Smith attempted to avoid him.  He even threatened her, saying that he was going to "kill [her] ass".

**G.   Defendant Officer D Sexually Assaulted Ms. Smith by Inserting Her Finger in Ms. Smith's Vagina in an Alleged Search for Contraband with the Help of Defendants Sergeant A and Unidentified Officer, Which Ms. Smith Reported to Her Prison Psychologist and Defendants Grievance Supervisor A and Investigator A.**

98.   On June 4, 2019, while in group therapy, Ms. Smith got into a disagreement with another inmate.  She was upset by the correction officers' handling of the situation and asked a sergeant in the area, Sergeant S, to return her to her cell. Sergeant S directed Defendant Officer D to escort Ms. Smith.  Ms. Smith protested that she did not want Defendant Officer D to touch her, which upset Defendant Officer D, who then tried to handcuff Ms. Smith.  Sergeant S then instructed Defendant Officer D to back off of Ms. Smith, which was embarrassing to Defendant Officer D, and Sergeant S instructed another officer to escort her to her cell.

99.   Later that day, Defendant Officer D came to Ms. Smith's cell to deliver a menu and an argument ensued.  Defendant Officer D then screamed, falsely claiming that Ms. Smith had hit her through the bars and called for Defendant Sergeant A—a sergeant—to come discipline her.

100.     When Defendant Sergeant A arrived, he asked Ms. Smith whether she had hit Defendant Officer D.  She showed him that she could not possibly have fit her hands through the bars of her cell, and Defendant Sergeant A declined to discipline Ms. Smith.  This again upset and embarrassed Defendant Officer D, who was attempting to get her in trouble.

101.     Later that day, around 5:00 PM or 6:00 PM, Defendants Sergeant A and Unidentified Officer came to handcuff and chain Ms. Smith so they could escort her to the recreation yard.  The handcuffs were placed around Ms. Smith's hands and the chain around her waist.

102.     As they were walking into the elevator, Defendant Officer D saw them and also entered the elevator, even though she was not escorting Ms. Smith. Defendant Unidentified Officer and Ms. Smith were in the back of the elevator, with Defendant Unidentified Officer holding Ms. Smith's chain.  Defendant Sergeant A was standing toward the front.

103.     Once the group was gathered inside the elevator, Defendant Officer D baselessly claimed Ms. Smith was hiding contraband and, not wearing gloves, reached inside Ms. Smith's pants and underwear and inserted at least one finger into her vagina, scratching her.  Ms. Smith tried to move away from Defendant Officer D, but Defendant Unidentified Officer yanked her back by the chain.  Defendant Officer D then punched Ms. Smith twice on her forehead, and Defendant Unidentified Officer held her chain so that she could not move away or defend herself.  On information and belief, Defendant Officer D was acting in retaliation for Ms. Smith's earlier conduct with respect

36

to Defendant Officer D.  Defendant Sergeant A, though he was in a position of authority, did nothing to intervene.

104.    After getting off the elevator, Ms. Smith was upset and demanded that Defendant Sergeant A allow her to seek medical attention.  He responded by feigning ignorance and asking the other correction officers if they had seen anything, and they all claimed that they had not.  When Ms. Smith showed Defendant Sergeant A the lump and marks on her face from Defendant Officer D's attack, Defendant Sergeant A asked her mockingly whether Ms. Smith had simply hit her head earlier while she was in her cell.

105.    Ms. Smith then screamed for a lieutenant or captain.  Defendant Sergeant A's supervisor—Lieutenant C—arrived, and Ms. Smith told her what happened. Lieutenant C directed Defendant Sergeant A to escort Ms. Smith to the medical unit, take pictures of her injuries and make sure she was treated.

106.    After Ms. Smith was brought to the medical unit, medical care was delayed for many hours, during which time, the redness and swelling from her injuries were reduced in visibility.  Although a nurse eventually examined Ms. Smith, Defendant Sergeant A never took pictures, as he had been directed to do.

107.    Ms. Smith filed a grievance describing Defendant Officer D's assault and abusive frisk on the evening of June 4, 2019.  She also reported the abusive frisk to Nurse D who examined her around 9:00 PM on June 4, 2019.  Ms. Smith returned to her cell, but requested to be examined properly around 4:00 AM, at which time she was removed from her cell and placed in a restraint chair, which is where an inmate sits with her feet shackled but her hands free of handcuffs, waiting for a nurse to arrive.  Ms. Smith was examined again around 4:00 AM on June 5, 2019, by another nurse (name

37

unknown) and the nurse prepared an injury report, noting bruises to Ms. Smith's forehead and swelling and scratches on her wrists, and advised Ms. Smith to apply ice to keep the swelling down.

108.   After spending hours in the restraint chair, Ms. Smith met with her psychologist early in the morning on June 5, 2019.  Her psychologist noted that Ms. Smith "reports being assaulted/ sexually assaulted by an officer in the elevator on the way to rec yesterday", and "[s]he stated that she does not feel safe".

109.   After meeting with her psychologist, Ms. Smith returned to her cell in the TBU.  She later reported the assault in the elevator to Defendant Grievance Supervisor A.

**H.   Defendants Officer C and Sergeant B Raped Ms. Smith While She was Alone in the Medical Clinic, Which She Reported to her Prison Psychologist and in an Inmate Grievance.**

110.   The day after the abusive frisk in the elevator, Ms. Smith experienced chest pains while in her cell.  She was distraught and short of breath.  As a result, Defendant Sergeant B and another correction officer escorted her to the medical clinic, a location where frequent sexual activity occurs because of the numerous private locations and the lack of cameras.

111.   Once they reached the clinic area, they saw Defendant Officer C, who regularly worked on the floor of the clinic.  Defendants Officer C and Sergeant B are known among the inmate population to be friends.  Defendant Officer C joined Defendant Sergeant B as they escorted Ms. Smith to a medical clinic room where they met Nurse T and another nurse, both of whom were male.  At some point, the third correction officer in the escort restrained Ms. Smith on the examination table.  After the

nurses examined Ms. Smith, Defendant Sergeant B, taking advantage of his position of authority as a sergeant, ordered everyone to leave except for Defendant Officer C.

112.     Once they were alone in the room with Ms. Smith, Defendant Officer C asked Defendant Sergeant B what they were going to do with her.  Defendant Sergeant B told Defendant Officer C to "get your nut on" (which means to have sex in street slang).  At that point, Defendant Officer C first put on a condom and raped Ms. Smith while she remained restrained on a clinic table and Defendant Sergeant B was outside the curtain around the table.  While Defendant Officer C was raping Ms. Smith, she tried to scream, at which point, Defendant Sergeant B came inside the curtain and put both hands over her mouth so hard that he injured her.  She remained silent while she was raped to avoid being hurt again.  After Defendant Officer C ejaculated, Defendant Sergeant B put on a condom and raped Ms. Smith.  Neither had a body camera on during the rapes.

113.     After they finished, Defendants Officer C and Sergeant B dragged Ms. Smith out of the clinic and took her to the infirmary, where she was to have been on close observation due to her mental state.

114.     Defendants Officer C and Sergeant B targeted Ms. Smith when she was most vulnerable.  She learned in April 2019 that her twin sister had been involved in a terrible accident and was in a coma and on life support.  This difficult news, coupled with consistent abuse and mistreatment by Defendants, rendered Ms. Smith more readily agitated in the period leading up to the rape.  Ms. Smith's distress made her a particularly easy target.

39

115. After the rape, Ms. Smith filed a grievance saying she had been raped in the clinic by Defendants Officer C and Sergeant B. The grievance states that she "need[s] help" and "no doctor [has] looked at injuries or take[n] pictures", and she is "not safe" and is "scared for [her] life".

116. Psychiatric and nurse progress notes over the following days document Ms. Smith's distress. Nursing progress notes from June 6, 2019, state that Ms. Smith "reported . . . she does not feel safe and wants to sign into protective custody". Nursing progress notes submitted daily from June 7-10, 2019 document that Ms. Smith continued to express fear for her safety and continued to request protective custody.

117. On or before June 18, 2019, Ms. Smith spoke with a nurse practitioner about the rapes, and he instructed her to write a statement to a sergeant about the incident. He told Ms. Smith he would "take care of it".

118. In addition to speaking with the nurse practitioner, Ms. Smith reported the rapes to her regular psychologist and a medical doctor. On June 20, 2019, the doctor ordered testing for HIV, Hepatitis C and Hepatitis B and prescribed Rocephin, doxycycline and flagyl—medications that are administered to rape victims to prevent sexually transmitted infections. These medications were not administered to Ms. Smith until July 30, 2019, at which point they likely would have been of limited to no use. Ms. Smith likewise did not have her blood drawn to test for sexually transmitted infections until mid-July.

119. Ms. Smith also reported the rapes to Defendants Kaplan, Velez, Captain A and Grievance Supervisor A. Ms. Smith's mother contacted the prison to

40

lodge a complaint that Ms. Smith was being mistreated, after which Lieutenant C spoke with Ms. Smith and prepared a written report of the rape.

120.    On June 14, 2019, Ms. Smith had a legal call with The Legal Aid Society. The Legal Aid Society sent a letter to Defendants Effman and Nunez on June 20, 2019, detailing Ms. Smith's allegations regarding the sexual assault by Defendant Officer C (referred to in the letter as "Hill"), the abusive frisk by Defendant Officer D and the rapes by Defendants Sergeant B and Officer C. The letter asked Defendants Effman and Nunez to preserve all video and body camera footage from the dates surrounding the reported incidents and to preserve logbooks from these dates. The letter further asked Defendants Effman and Nunez to investigate the allegations of abuse, including all related misconduct, including the failure to turn on body cameras when staff are outside the location of fixed cameras. The letter requested a response explaining what steps were being taken to protect Ms. Smith from further harm.

121.    Attorneys from The Legal Aid Society sent a second letter on July 5, 2019, clarifying that the correction officer referred to in the June 20 letter as "Hill" was in fact Defendant Officer C and identifying the two officers with whom Defendant Officer C spoke after the oral sex incident as Defendants Officer B and "Officer A". The letter further relayed the act of sexual harassment on May 20, 2019 by Defendant Officer C, and asked that DOCCS preserve any fixed camera footage of the incident.

122.    The Legal Aid Society attorneys requested that Ms. Smith be kept separate from Defendants Officer C, Sergeant B and Officer D and not allow these individuals to be alone with Ms. Smith or escort her within the prison.

123.    The letter further requested that DOCCS ensure that its staff is adhering to DOCCS's body camera policies and have their body cameras on whenever they are outside the view of the fixed cameras.

124.    The Legal Aid Society further requested that the prison abide by its obligations under PREA, including by providing Ms. Smith with timely, unimpeded access to emergency medical treatment and crisis intervention services and be offered access to forensic medical examinations.

125.    On information and belief, The Legal Aid Society never received any response to their June 20, 2019, or July 5, 2019, correspondence.

126.    Even after Ms. Smith reported the sexual abuse and The Legal Aid Society sent its first letter, Defendants were permitted to remain in contact with Ms. Smith.  As noted above, Defendant Officer C was able to threaten her.  Defendant Officer D continued to work her same shift and locations, leading to further interactions with Ms. Smith.  In one such interaction, Defendant Officer D told her that she was "over it" and that if Ms. Smith wanted to press charges, she should go ahead and do so and that she "fight[s] men in the men's jail".  After Ms. Smith had reported the rapes, Defendant Sergeant B was assigned to escort a group of inmates, including Ms. Smith; scared about going anywhere with Defendant Sergeant B, Ms. Smith asked another sergeant in the area why Defendant Sergeant B was allowed to be there.  Defendant Sergeant B had also approached her to handle some of her grievances.  She told him that she did not want to speak with him.

I.      **Defendants Annuci, Effman, Kaplan, Daye and Velez Are Responsible for Preventing Sexual Abuse and Retaliatory Actions Against Victims at BHCF.**

127.    Defendant Annucci was at all relevant times responsible for enacting policies and procedures to protect the safety of inmates incarcerated in DOCCS and ensuring that the policies and practices are enforced in DOCCS facilities.

128.    Under 28 C.F.R. § 115.11(b), DOCCS is required to employ or designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement and oversee agency efforts to comply with PREA standards in all its facilities.  On information and belief, Defendant Effman was at all relevant times the individual charged with these responsibilities for DOCCS.

129.    Defendants Kaplan, Daye and Velez were at all relevant times responsible for the safety of the inmates at BHCF.  Defendants Kaplan, Daye and Velez were at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the inmates at BHCF.

130.    Defendants Kaplan and Velez failed to implement policies or procedures required under PREA to protect inmates from sexual abuse at BHCF.  Despite repeated instances of officer sexual abuse of inmates, inappropriate sexual remarks by officers to inmates, widely known sexual relationships between officers and inmates and retaliatory actions upon the victims, Defendants Kaplan and Velez failed to discipline officers or otherwise enact or enforce policies to correct the pervasive custom of abuse at BHCF.

**J.      Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez Were Aware of the Substantial Risks of Sexual Abuse to Female Prisoners in DOCCS Facilities and in BHCF in Particular.**

131.      Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that Congress enacted PREA in 2003 to address and reduce the high rates and risk of sexual assault in prison.

132.      Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that New York enacted N.Y. Penal Law § 130.05(3)(e) to address high rates of sexual assault within New York prisons, and that this statute makes clear that an inmate cannot legally consent to any sexual act with DOCCS staff and criminalizes any sexual activity between DOCCS staff and inmates.

133.      Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that DOCCS has a "zero tolerance" policy for sexual activity with, or harassment of, inmates.

134.      Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware of DOCCS's obligations under PREA to mitigate the risk of sexual assault and the exploitation of and harassment to female inmates within DOCCS facilities, including by screening inmates for risk of victimization; developing a coordinated response for treatment and investigation of alleged instances of abuse, including providing prompt medical attention and an opportunity to speak with a victim advocate and crisis intervention counselor; promptly and thoroughly investigating complaints of sexual assault and notifying victims of the results of the investigation; and training employees on inmates' rights to be free from sexual abuse, the dynamics of sexual abuse in confinement and the common reactions of sexual abuse victims.

44

135.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that certain factors and characteristics render inmates more vulnerable to sexual abuse in prison, including mental health difficulties, cognitive disabilities, slight build and prior experience of sexual exploitation, rape or abuse.

136.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that sexual assault and exploitation in DOCCS facilities, and in BHCF in particular, is rampant and takes many forms.  These Defendants were aware, for instance, that correction officers will sometimes "groom" vulnerable inmates by spending time with them, giving them gifts, commenting on their bodies or granting reprieves for violations of minor prison rules, in order to gain their trust and later exploit that trust to initiate sexual contact or request sexual favors in return.

137.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that sexual harassment, exploitation and assault of inmates by staff is a persistent and prevalent problem at BHCF, and that numerous instances of staff sexual misconduct at BHCF by officers have resulted in criminal charges.  For instance:

    i.     In 2009, David Sawyer, a sergeant at BHCF, pleaded guilty to third-degree rape of an inmate.[30]

    ii.     In 2010, Fredrick Brenyah, a correction officer at BHCF, was convicted of attempted rape of an inmate.[31]

---

[30]Thane Grautel, *Bedford Hills correction officer arrested on rape charge*, LoHud (Dec. 12, 2014), https://www.lohud.com/story/news/crime/2014/12/12/bedford-hills-co-arrested-rape-charge/20299949/.
[31]*Id.*

iii.    In July of 2014, Richard Rodriguez, a correction officer at BHCF, was arrested and charged with third-degree rape of an inmate.  He pleaded guilty in October of 2014.[32]

iv.    In July of 2014, Kevin R. Fields, a correction officer at BHCF, was arrested and charged with third-degree rape.[33]

v.    In December of 2014, Jose Guzman, a correction officer at BHCF, was arrested and charged with third-degree rape of an inmate.[34]

vi.    In August of 2015, Ruben Garcia, a correction officer at BHCF, was arrested and charged with the rape of two inmates.[35]

vii.    In December of 2015, Rasheen Smalls, a correction officer at BHCF, was arrested and charged with the rape of an inmate.[36]

viii.    In December of 2015, Ruben Illa, a correction officer at BHCF, was charged with making a false report to conceal an improper relationship with an inmate.[37]

---

[32]Reutter, *supra* note 15.

[33]*Id.*

[34]Nina Schutzman, *Prison guard from Wappingers had 'sexual contact' with inmate*, Poughkeepsie Journal (Dec. 14, 2014), https://www.poughkeepsiejournal.com/story/news/crime/2014/12/14/wappingers-correction-officer-rape/20395631/.

[35]Reutter, *supra* note 15.

[36]Alfred Branch, *Former Guard Arrested for Having Sex with Inmate:  State Police*, Patch (Dec. 23, 2015), https://patch.com/new-york/bedford/former-guard-arrested-having-sex-inmate-state-police.

[37]Shayna Jacobs, *Ex-corrections officer turns himself in for filing fake report that covered up his sex with inmate*, Daily News (July 12, 2017), https://www.nydailynews.com/new-york/ex-jail-officer-surrenders-report-hid-sex-inmate-article-1.3321513.

     ix.     On August 15, 2017, Jeffrey Green, a correction officer at BHCF, was sentenced to nine months in prison for sexually assaulting an inmate.[38]

138.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that DOCCS staff and officials—including several of the Defendants here—have been party to a number of injunctive and damages cases brought in both state and federal courts by female prisoners who have been victims of staff sexual abuse at BHCF.  These cases include *Amador v. Andrews*, No. 1:03-cv-00650-KTD-GWG (S.D.N.Y. 2003), *Jones v. Annucci*, No. 1:16-cv-01473-RA (S.D.N.Y. 2016), *Doe v. Kaplan*, No. 7:16-cv-09870-NSR (S.D.N.Y. 2018), *Pusepa v. Annucci*, No. 1:17-cv-07954-RA-OTW (S.D.N.Y. 2019) and *Stone v. Annucci*, No. 1:20-cv-01326-RA (S.D.N.Y. 2020).

139.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that several women have brought similar claims against the State for sexual harassment, exploitation and abuse by officers in the New York State Court of Claims, including suits involving officers with prior complaints of sexual abuse. *See, e.g.*, *Patterson v. State of New York*, 44 Misc. 3d 1230(A) (N.Y. Ct. Cl. Aug. 29, 2014) (granting the claimant's motion for summary judgment and finding State liable when an officer sexually assaulted her following repeated complaints of sexual abuse by other prisoners)*; Anna O. v. State*, No. 114085, M-80202 (N.Y. Ct. Cl. Aug. 15, 2012)

---

[38]U.S. Dep't of Just., *Former Correction Officer Sentenced to 9 Months in Prison for Violating Inmate's Civil Rights Through Abusive Sexual Contact* (Aug. 15, 2017), https://www.justice.gov/usao-sdny/pr/former-correction-officer-sentenced-9-months-prison-violating-inmate-s-civil-rights.

(finding State liable when "Defendant had notice of [Officer's] propensity to pursue

unauthorized relationships with inmates and yet left him in the position to continue to

pursue the same, which was the proximate cause of the later rape of Claimant by

[Officer]."); *Morris v. State*, Cl. No. 100694-A, M-80583 (N.Y. Ct. Cl. Mar. 6, 2012)

(finding State liable when Officer had multiple previous unsubstantiated allegations of

sexual assault against him, and was permitted to continue supervising inmates, in some

cases as a roundsman under "diminished supervision").

140.    Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan,

Daye and Velez were aware that the above cases and reported complaints represent only a

fraction of incidents of sexual harassment, exploitation and abuse in prisons, given the

prevalence of under-reporting in such environments.[39]

141.    On information and belief, Defendants Annucci, Effman, Maher,

Nunez, Shipley, Kaplan, Daye and Velez were aware of prior complaints against one or

more of the correction officers named in this Complaint, including Defendant Sergeant B.

**K.    Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez Failed To Enact Supervisory Policies that Would Prevent Sexual Abuse by DOCCS Staff, and Defendants Annucci, Effman, Maher, Nunez, Shipley,**

---

[39]Kubiak et al., *supra* note 8, at 361 ("[S]tudies related to the reporting of sexual assault among college students, military services members, and prison inmates suggest rates even lower than the national average. However, incarceration may be a particularly challenging setting in which to report a sexual assault, particularly if the assault was perpetrated by a staff member.") (internal citations omitted); U.S. Dep't of Just., *Prison Rape Elimination Act Regulatory Impact Assessment*, 17 (May 17, 2012), https://www.prearesourcecenter.org/sites/default/files/library/prearia.pdf ("[O]nly a fraction of incidents of sexual abuse in a prison environment will typically come to the attention of correctional authorities or be reflected in institutional records."); Am. C. L. Union, *Caught in the Net: The Impact of Drug Policies on Women and Families*, 47 (2005), https://www.aclu.org/caught-net-impact-drug-policies-women-and-families ("Incarcerated women told human rights monitors that they were reluctant to file grievances, fearing that prison officials would not believe them and that staff would retaliate.").

**Kaplan, Daye, Velez, Captain A, Captain B, Lieutenant A, Sergeant A and Sergeant B Failed To Enforce Existing Policies.**

142.     Despite knowing of the risk and frequency of sexual misconduct by prison staff (including supervisory staff) in BHCF, Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez recklessly disregarded those risks and failed to protect the inmates in their custody from harm.

143.     Defendants Annucci, Effman, Kaplan, Daye and Velez inadequately supervised and trained correction officers and higher-level staff, thereby placing female inmates at a heightened risk of sexual assault and abuse.

144.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez failed to enact new policies or enforce existing policies intended to protect female inmates from sexual abuse by prison staff.

145.     Defendants Annucci, Effman, Kaplan, Daye and Velez supervised male staff guarding female inmates no differently from the way they would supervise same-gender supervision of men and failed to provide any specific training for staff on how to manage female offenders.

146.     Defendants Annucci, Effman, Kaplan, Daye and Velez permitted correction officers to access female inmates in unmonitored areas for extended periods of time, allowed correction officers to escort female inmates unaccompanied and unmonitored and enabled correction officers to coordinate among themselves to help each other avoid detection or repercussions while committing acts of sexual assault and abuse.

49

147.    On information and belief, Defendant Kaplan allowed male correctional staff, including Defendants Officer C and Sergeant B, to choose their own assignments without regard to the number or severity of prior allegations made against them by female inmates.

148.    On information and belief, Defendants Annucci, Effman, Kaplan, Daye and Velez failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constitutes warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular prisoner, repeatedly requesting a particular prisoner for a particular assignment, discussing their personal life with a prisoner or asking a prisoner personal questions.  Staff were not disciplined or informally counseled when supervisors witnessed behavior that is indicative of warning signs of sexual abuse.

149.    On information and belief, Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez failed to employ obvious measures to reduce the risk of sexual misconduct between staff and women prisoners and to prevent misconduct from occurring, escalating or continuing.  These include measures such as heightened monitoring of situations where there have been warning signs of sexual misconduct or inappropriate relationships; preventing staff access to an inmate who has made allegations of sexual misconduct toward the staff while the allegation is investigated; searches of correctional staff; use of lie detectors; real-time review of video camera feeds; periodic review of camera footage; use of electronic recording devices; exit interviews of prisoners upon transfer and release; random interviews of staff and prisoners; and frequent, varied and unannounced rounds by supervisory officials.

50

150.     Defendants Annucci, Effman, Maher, Nunez, Shipley and Daye failed to ensure that investigators applied consistent standards in determining whether to substantiate an allegation of staff sexual misconduct and refer it for administrative action or timely obtain physical evidence when such evidence was available.

151.     Defendants Annucci, Effman, Maher, Nunez, Shipley and Daye failed to ensure that investigators gave weight to indicia of sexual misconduct in the absence of physical evidence, including evidence of staff persons being seen out of place; staff persons engaging in behavior suggestive of an inappropriate relationship; and staff giving contradictory statements to investigators.

152.     Defendants Annucci, Effman, Maher, Nunez, Shipley and Daye failed to ensure that investigators gave adequate weight to the credibility of prisoner witnesses and failed to ensure that investigators did not give undue weight to statements of staff.

153.     Defendants Annucci, Effman, Maher, Nunez, Shipley and Daye failed to ensure that investigations into allegations of sexual abuse were thoroughly and timely conducted, and thus, they often resulted in biased and unreliable refusals to substantiate women prisoners' complaints.

154.     On information and belief, Defendants Annucci, Effman, Maher, Nunez, Shipley and Daye failed to ensure that their investigations gave adequate weight to similar prior complaints of sexual misconduct against the same staff member.  Such patterns may include allegations that a staff member has used the same language in propositioning more than one woman prisoner or allegations that an officer has taken more than one woman prisoner to the same location to engage in sexual abuse.

51

155.     Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez created a culture, custom and practice of ignoring sexual abuse and assault by failing to investigate or discipline BHCF officers who knew of instances of sexual abuse, assault or harassment against inmates by DOCCS staff and failed to report such information.

156.     On information and belief, none of the events described in paragraphs 63-66 and 70-126 resulted in appropriate investigations into or disciplinary action against staff members who knew of the misconduct and failed to report it, even though Ms. Smith reported these incidents of abuse.

157.     Defendants Annucci, Effman, Kaplan, Daye and Velez have failed to take sufficient action when officers leave their assigned posts, go to areas of the prison where they have no work-related reason to enter and engage in behavior that is clearly suggestive of inappropriate harassment or relationships.

158.     On May 20, 2019, Defendant Lieutenant A allowed Defendant Officer C to enter the TBU for no work-related reason.  While there, Defendant Officer C made inappropriate sexual comments to and gestures at Ms. Smith.  Defendant Officer C also had no reason to be in the package room on April 9, 2019 or the medical clinic on June 4, 2019, where Defendant Sergeant B permitted him, neither of which were his assigned areas.  He was never reported, disciplined or reprimanded for this behavior.

159.     Defendants Annucci, Effman, Kaplan, Daye and Velez failed to promulgate policies that provided for additional rounds to more closely supervise staff about whom complaints of sexual abuse had been made.

52

160.    Staff who were the subject of credible or repeated allegations of sexual abuse were allowed to continue their usual posts and permitted to access private or unmonitored areas.  They were even permitted to continue to guard or have contact with or proximity to inmates who have complained about the officer.

161.    To the extent Defendants Annucci, Effman, Kaplan, Daye and Velez installed or required installation of surveillance cameras, use of those cameras for supervision or investigation was, at all relevant times, grossly inadequate to protect female inmates.

162.    Surveillance cameras were not installed in many locations at BHCF.  Many enclosed and isolated areas inside the prison, or isolated areas on the grounds of the prison, where sexual abuse is more likely to occur, or has been reported to have occurred, are completely outside of any video or audio surveillance.  These areas included the area outside the package room and certain parts of the recreation yard.

163.    For areas for which there were privacy concerns, like the medical units, clinic and infirmary, Defendants Annucci, Effman, Kaplan, Daye and Velez permitted officers to have virtually unfettered access to private, unmonitored regions within these areas and failed to set up camera surveillance.

164.    Defendants Annucci, Effman, Kaplan, Daye and Velez failed to prohibit officers from being alone with women prisoners in such areas where sexual abuse of female inmates is easily accomplished.  When instances of staff sexual misconduct were substantiated, they were often found to have occurred in these isolated, and largely unmonitored, areas.

165.    It was widely known in BHCF among the inmates and staff that certain areas in the recreation yard, outside the package area and in medical units were not monitored and that frequent sexual activity between staff and inmates occurred there. Defendants Effman, Kaplan, Daye, Velez, Captain A, Captain B, Lieutenant A, Sergeant A and Sergeant B took no action to locate these blind spots or encourage staff to report them.

166.    It is also widely known in BHCF that DOCCS staff frequently do not wear or turn on their body cameras, even when male staff are alone with female inmates and out of view of fixed cameras.  Defendants Effman, Kaplan, Daye, Velez, Captain A, Captain B, Lieutenant A, Sergeant A and Sergeant B failed to ensure that policies requiring wearing active body cameras were followed consistently and that appropriate discipline was issued for non-compliance by a staff member.

167.    To the extent DOCCS nominally requires staff to wear or turn on body cameras, use of those cameras for supervision or investigation was, at all relevant times, grossly inadequate to protect female inmates.

168.    Defendant Sergeant B took advantage of the lack of cameras (both fixed and otherwise) within BHCF to assault Ms. Doe in the bathroom in the school building.

169.    Defendant Sergeant B took advantage of the lack of cameras (both fixed and otherwise) within BHCF to direct Ms. Smith to a room where he could masturbate while having her expose her breasts.

54

170.    Defendant Officer C took advantage of the lack of cameras (both fixed and otherwise) in the area outside the package room to force Ms. Smith to perform oral sex on him on April 9, 2019, without getting caught.

171.    Defendants Officer C and Sergeant B took advantage of the lack of cameras (both fixed and otherwise) in the medical unit to rape Ms. Smith on June 5, 2019, without getting caught.

172.    On information and belief, Defendants Annucci, Effman, Kaplan, Daye and Velez failed to enact and enforce adequate rules and policies that dictated the content and substance of limited supervisory rounds.

173.    On information and belief, facility supervisory rounds consisted of merely stopping by the assigned line officer's desk or office, signing the logbook and nothing more.

174.    On information and belief, there was no requirement that supervisory staff must see each officer on duty, check in verbally with each officer, ask the officers any particular questions, speak with the prisoners in a housing unit or program assignment, or ask them if they have problems, or that they observe the entire area, the prisoners and the staff, for any misconduct, or make any notations on what they observe.

175.    On information and belief, supervision did not include observation and counseling or discipline for officers engaged in behavior evincing warning signs of sexual abuse, including engaging in personal conversations with inmates, sharing personal items with inmates or repeatedly requesting a particular inmate for special assignments in secluded locations.

55

176.    On information and belief, Defendants Annucci, Effman, Kaplan, Daye and Velez failed to require a set number and frequency of supervisory rounds by most supervisory officers.  Only rounds by Defendant Kaplan and her executive team were required at a specified frequency, and that was only once a week, with no other written policies and procedures directing the frequency and regularity of rounds.  In practice, sergeants typically visit each post once or twice per shift.

177.    Defendants Annucci, Effman, Kaplan, Daye and Velez failed to require unpredictable supervisory rounds.  Facility supervisors routinely conducted rounds in a predictable manner, failing to vary their time, frequency and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor has passed through, when they can virtually be assured that they can engage in misconduct with female inmates without being discovered.

178.    When Defendant Officer C began to escort Ms. Smith from the package room on April 9, 2019, he knew the timing of supervisors' rounds.  This knowledge of a set schedule enabled him to be confident that he would not be interrupted as he sexually abused Ms. Smith, particularly because two other officers served as "lookouts" for him in the recreation yard.

179.    When Defendant Sergeant B escorted Ms. Smith to the medical clinic on June 5, 2019, ostensibly to get her medical help, he knew the timing of supervisors' rounds.  This knowledge of a set schedule enabled him to be confident that he and Defendant Officer C would not be interrupted as they sexually abused Ms. Smith.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS OFFICER C, OFFICER D, UNIDENTIFIED OFFICER AND SERGEANT B

### EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### -Cruel and Unusual Punishment-

180.    Plaintiffs repeat and reallege paragraphs 1-179 as though set forth in full herein.

181.    In forcing Ms. Doe to perform oral sex on him in the spring of 2019, Defendant Sergeant B acted willfully and wantonly for his own sexual gratification.

182.    In directing Ms. Smith to expose her breasts to him while he masturbated, Defendant Sergeant B acted willfully and wantonly for his own sexual gratification.

183.    In forcing Ms. Smith to perform oral sex on him on April 9, 2019, in entering the TBU for no work-related purpose on May 20, 2019, to blow Ms. Smith a kiss and tell her he loved her, and in raping Ms. Smith in the medical clinic on June 5, 2019, Defendant Officer C acted willfully and wantonly for his own sexual gratification.

184.    In raping Ms. Smith on June 5, 2019, after determining that she was in a vulnerable state following the assault she suffered just one day earlier, Defendant Sergeant B acted willfully and wantonly for his own sexual gratification.

185.    In shoving an ungloved hand down Ms. Smith's pants and sticking a finger in her vagina while Defendant Unidentified Officer held Ms. Smith in place and then punching her in the face while she remained restrained in an elevator on June 4,

2019, Defendant Officer D acted willfully and wantonly for her own sexual gratification and sadistic purposes.

186.    In restraining Ms. Smith and holding her steady while Defendant Officer D abusively frisked her and then punched her in the face, Defendant Unidentified Officer acted willfully and wantonly for her own sadistic purposes.

187.    There was no penological justification for the conduct set forth in paragraphs 181-186 above.

188.    Defendant Sergeant B's, Defendant Officer C's, Defendant Officer D's,  and Unidentified Officer's conduct was unreasonable and violated Plaintiffs' clearly established constitutional right to be free from cruel and unusual punishment.

189.    Defendant Sergeant B's, Defendant Officer C's, Defendant Officer D's  and Unidentified Officer's conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS VELEZ, CAPTAIN A, CAPTAIN B, SERGEANT A, LIEUTENANT A, OFFICER A, OFFICER B, GRIEVANCE SUPERVISOR A, INVESTIGATOR A AND UNIDENTIFIED OFFICER**

**EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**-Failure To Protect-**

190.    Ms. Smith repeats and realleges paragraphs 1-179 as though set forth in full herein.

191.    Correction officers and staff, including contractual staff, have a duty to report any allegation of sexual abuse or sexual harassment of an inmate, and to report any actual knowledge or reasonable belief concerning any incident of sexual

abuse, sexual harassment or the existence of an inappropriate relationship between a staff member and an inmate.

192.    Correction officers and staff have a duty to take reasonable steps to protect inmates in their care and custody and to intervene when the constitutional rights of inmates are violated.

193.    The above-named Defendants violated this duty when they deliberately ignored evidence that Defendants Sergeant B, Officer C and Officer D had sexually abused and harassed Ms. Smith and failed to take any meaningful steps to protect Ms. Smith from this abuse.

194.    The deliberate failures of these Defendants, acting under color of state law, to protect Ms. Smith from abuse violated her right to be free from cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments of the U.S. Constitution.

195.    As a direct and proximate cause of these deliberate acts and omissions, Ms. Smith suffered severe physical and psychological harm.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANT OFFICER E

**EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**-Failure To Protect-**

196.    Ms, Doe repeats and realleges paragraphs 1-179 as though set forth in full herein.

197.    Correction officers and staff, including contractual staff, have a duty to report any allegation of sexual abuse or sexual harassment of an inmate, and to report any actual knowledge or reasonable belief concerning any incident of sexual

abuse, sexual harassment or the existence of an inappropriate relationship between a staff member and an inmate.

198.    Correction officers and staff have a duty to take reasonable steps to protect inmates in their care and custody and to intervene when the constitutional rights of inmates are violated.

199.    Defendant Officer E violated this duty when he failed to intervene while Defendant Sergeant B was assaulting Ms. Doe, despite knowing what was taking place.  Defendant Officer E failed to take any steps to protect Ms. Doe from this abuse.

200.    The deliberate failure of Defendant Officer E, acting under color of state law, to protect Ms. Doe from abuse violated her right to be free from cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments of the U.S. Constitution.

201.    As a direct and proximate cause of these deliberate acts and omissions, Ms. Doe suffered severe physical and psychological harm.

### FOURTH CLAIM FOR RELIEF AGAINST SUPERVISORY DEFENDANTS ANNUCCI, EFFMAN, NUNEZ, KAPLAN, MAHER, SHIPLEY, DAYE AND VELEZ

### EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
**-Failure To Implement Policies and Practices To Avoid Violations of Constitutional Rights and Failure To Train/Supervise Employees-**

202.    Plaintiffs repeat and reallege paragraphs 1-179 as though set forth in full herein.

203.    Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that correction officers at BHCF were repeatedly accused, charged and criminally convicted of sexually abusing female inmates.

204.    At the time of the events at issue, Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were aware that correction officers at BHCF routinely carried on sexual relationships with inmates, which was also known to the inmate population.

205.    Defendant Velez knew from Ms. Smith's prison file that she was at high risk of sexual harassment, exploitation and abuse given her history of being a victim of sexual exploitation, psychological conditions and small build.

206.    Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez nevertheless failed to implement or enforce policies to protect Ms. Smith, Ms. Doe or other inmates at BHCF from sexual abuse and harassment by correction officers and higher-level staff.

207.    At the time of the events at issue, Defendant Sergeant B was known to have engaged in sexual relationships with inmates.  Despite that, Defendants Kaplan, Daye and Velez failed to prevent him from interacting with inmates or from being alone with inmates without adequate camera coverage or supervision.

208.    As of May 21, 2019, Defendant Officer C had been accused of forcing Ms. Smith to perform oral sex and yet, Defendants Kaplan, Daye and Velez failed to prevent Defendant Officer C from being able to have access to Ms. Smith.

209.    Through their acts and omissions, Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez created a custom and implicit policy

authorizing BHCF staff to deliberately ignore evidence of sexual misconduct and sexual assault on the part of correction officers against female inmates.

210.    Defendants Annucci, Effman, Maher, Nunez, Shipley, Kaplan, Daye and Velez were deliberately indifferent to the serious risk of sexual violence and harassment of female inmates at the hands of correction officers at BHCF.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Defendants, jointly and severally, as follows:

a.    Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

b.    Awarding Plaintiffs punitive damages in an amount to be determined at trial which is sufficient to deter Defendants from future unlawful conduct;

c.    Awarding Plaintiffs costs, disbursements and reasonable attorneys' fees; and

d.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

July 9, 2021

CRAVATH, SWAINE & MOORE LLP,

by

_/s/ David M. Stuart_
David M. Stuart
A member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
dstuart@cravath.com

_Attorney for Plaintiffs Jane Smith and Mary Doe_